977 A.2d 1132

Gary SPAHN, Appellant

v.

ZONING BOARD OF ADJUSTMENT, the City of Philadelphia and R.G. Woodstock Associates, LLC., Appellees

Society Created to Reduce Urban Blight (SCRUB), Mary Cawley Tracy, Wynnefield Heights Civic Association, Belmont Village Community Association, and George David, Jr.

v.

Zoning Board of Adjustment of the City of Philadelphia, the City of Philadelphia and Patrick B. Gillespie, Jr./Shannon Outdoor, LLC

Appeal of Society Created to Reduce Urban Blight (SCRUB), Mary Cawley Tracy, Wynnefield Heights Civic Association and Belmont Village Community Association.

Society Created to Reduce Urban Blight (SCRUB), Mary Tracy, Wecaccoe CDC, Whitman Council, Fred Druding and Jovida Hill, Appellants

v.

Zoning Hearing Board of Adjustment of the City of Philadelphia, City of Philadelphia, BDB Company and Keystone Outdoor Advertising, Appellees.

Supreme Court of Pennsylvania.

Argued Dec. 2, 2008.

Decided Aug. 18, 2009.

84

86

88

Samuel C. Stretton, Esq., Law Offices of Samuel C. Stretton, West Chester, for Gary Spahn, Society Created to Reduce Urban Blight (SCRUB)/M.C. Tracy/Wynnefield Hghts. Civic Ass'n/Belmont Village Comm. Ass'n, appellants.

Richard Gerson Feder, Esq., Cheryl Lorraine Gaston, Esq., City of Philadelphia Law Dept., for Zoning Bd. of Adjustment/City of Philadelphia, appellee.

Joseph Beller, Esq., Beller, Stouffer & Orphanides, L.L.P., for R.G. Woodstock Associates, LLC., appellee.

Lathrop Barrere Nelson, III, Esq., Montgomery, McCracken, Walker & Rhoads, L.L.P., Philadelphia, for Patrick B. Gillespie, Jr. and Shannon Outdoor, LLC, appellee.

Stephen G. Pollock, Esq., Montgomery, McCracken, Walker & Rhoads, L.L.P., Philadelphia, Vincent B. Mancini, Esq., Law Offices of Vincent B. Mancini & Associates, Media, John M. Elliott, Esq., Elliott Greenleaf, Blue Bell, for BDB Co. and Keystone Outdoor Advertising Co., Inc., appellees.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD and McCAFFERY, JJ.

## OPINION

Chief Justice CASTILLE.

The questions presented in this appeal arose from the General Assembly's enactment of Section 17.1 of the First Class City Home Rule Act ("Home Rule Act"), 53 P.S. § 13131.1.[1] The enactment occurred following the introduction of House Bill No. 1954 on September 9, 2003, which originally involved increasing the fines and penalties for Philadelphia Code ("Code") violations (Section 1 of the bill). The bill was then amended on November 19, 2004 and added Section 2 to the bill providing for standing in appeals from zoning matters as follows: [2]

> In addition to any aggrieved person, the governing body vested with legislative powers under any charter adopted pursuant to this act shall have standing to appeal any decision of a zoning hearing board or other board or commission created to regulate development within the city. As used in this section, *the term "aggrieved person" does not include taxpayers of the city that are not detrimentally harmed* by the decision of the zoning hearing board or other board or commission created to regulate development.

53 P.S. § 13131.1 (emphasis added). The Act was signed into law on November 20, 2004. Section 2 of the bill became Section 17.1 of the Home Rule Act.

1. Act of April 21, 1949, P.L. 65, § 17.1 added November 30, 2004 by P.L. 1523, No. 193, § 2, effective immediately.

2. The full title of the House Bill was:
 Amending the act of April 21, 1949 (P.L. 665, No. 155), entitled [reiterates title of Home Rule Act] further providing for the general grant of power and authority; AND PROVIDING FOR SPECIFIC POWERS.

The specific issues raised in this appeal are whether the Pennsylvania General Assembly removed general taxpayer standing from the Code by enacting Section 17.1 of the Home Rule Act; whether such action violated the single subject rule of the Pennsylvania Constitution; and whether appellants have standing to pursue the zoning challenges under traditional notions of standing.

The Commonwealth Court concluded that following the enactment of Section 17.1, taxpayer standing was no longer viable under the Philadelphia Zoning Ordinance. The court also concluded that the enactment did not violate the single subject rule and that appellants did not have standing. For the reasons stated herein, we affirm the orders of the Commonwealth Court.

Although the cases were consolidated before this Court because they all involve a challenge to the interpretation and constitutionality of Section 17.1, the matters arose as separate appeals and, therefore, the facts and procedural history of each case are distinct and are discussed separately.

### Spahn v. Zoning Board of Adjustment
### (25 and 26 EAP 2008)

R.G. Woodstock Associates ("Woodstock") is the owner of two vacant lots on Bainbridge Street in Philadelphia. The lots are in an area zoned R–10 residential district. In June of 2005, Woodstock filed two separate applications with the Philadelphia Department of Licenses and Inspections ("L & I") seeking to construct a three-story, single family home on each of the lots. L & I denied the permits because each residence did not have a roofed-over front porch with usable space underneath and failed to meet certain open area requirements of the Code. Woodstock appealed to the Zoning Hearing Board of Philadelphia ("Board") seeking a dimensional variance with respect to each lot. The Board conducted a hearing on August 17, 2005.

Prior to the hearing, Gary Spahn (one of the appellants herein) submitted a letter in opposition to the request. At the

hearing, the parties agreed that the front porch was not at issue but was the result of a clerical/labeling error on the design plans and the matter proceeded solely on the question of the open area requirements. The Code requires a minimum open area of 30% for lots in an area zoned R–10. The plans submitted by Woodstock only provided for an open area of 19% with respect to each lot. Spahn testified in opposition to the granting of the dimensional variance at the hearing. Following the hearing, the Board granted a variance with respect to each lot, concluding that Woodstock had presented sufficient evidence to meet the criteria necessary for a variance. Spahn appealed the grant of both variances and the trial court consolidated the appeals.

Before the trial court Woodstock filed a motion to quash the appeals on the basis that Spahn was not an aggrieved person having standing to appeal the Board's decision. Woodstock argued that the General Assembly's addition of Section 17.1 to the Home Rule Act eliminated the general standing granted to any taxpayer under Section 14–1807 of the Code to appeal a decision of the Board. The trial court agreed with Woodstock's interpretation of Section 17.1 and pointed out that Spahn did not present evidence to establish himself as an aggrieved party. Therefore, the trial court granted Woodstock's motion to quash the appeals on the basis that Spahn did not have standing to pursue them. Spahn appealed.

On appeal, a panel of the Commonwealth Court affirmed the trial court's order. *Spahn v. Zoning Bd. of Adjustment et al.*, 922 A.2d 24 (Pa.Commw.2007). As to Spahn's first argument, that Section 17.1 did not eliminate taxpayer standing, the court majority explained that it saw "no purpose" of the language of Section 17.1 "other than to limit the broad grant of general taxpayer standing provided" in the Code. *Id.* at 28. The court further noted that Section 17.1 limited the definition of "aggrieved person" by specifically excluding "taxpayer" from its definition. Therefore, "under Section 17.1, only a taxpayer with an interest that could be 'detrimentally' affected by a decision of an entity such as the Board has standing to appeal." *Id.*

Turning to the issue of whether the standing provision of the Code supersedes Section 17.1, the court acknowledged that the concept of home rule gives municipalities the right to enact such ordinances, but that the home rule municipality cannot exercise powers "contrary to, or in limitation or enlargement of, powers granted by acts of the General Assembly." *Spahn*, 922 A.2d at 29 (*quoting* 53 P.S. § 13133(b)). Thus, the General Assembly has the authority to negate ordinances enacted by a home rule municipality if the conflicting statute involves a substantive matter of statewide concern. Section 17.1 met this standard since "this issue involves access to the courts, a concern for every citizen [o]f this Commonwealth." *Id.* at 29.

The court then looked at the constitutionality of Section 17.1 under Article III, Section 3 of the Pennsylvania Constitution pertaining to the single subject requirement. Relying on this Court's pronouncement in *Pennsylvanians Against Gambling Expansion Fund v. Commonwealth*, 583 Pa. 275, 877 A.2d 383 (2005) (hereafter *"PAGE"*), the court explained that the rule was not violated so long as the amendments to the bill are "germane" to the bill's subject. Applying such a test, the court concluded that Spahn confused subject for content since, in this case, the standing language was germane to the subject of the bill—an amendment to the Home Rule Act, 53 P.S. § 13101 *et seq. See Spahn*, 922 A.2d at 30–31.

Finally, considering whether Spahn was an aggrieved party, the court agreed with the trial court's review of the record evidence that revealed that Spahn lived approximately one and a half blocks from the subject properties, but that he only walked by the properties every day. Thus, the court concluded that Spahn's interest was no different from "the interest common to all citizens regarding obedience to the law." *Id.* at 31.

Judge Simpson concurred in the result of the majority, writing separately to note his view that Section 17.1 may have violated the "clear expression of title requirement" contained in Article III, Section 3 of the Pennsylvania Constitution, but

concluding that such an argument was not preserved. *Spahn,* 922 A.2d at 31–32 (Simpson, J., concurring).

This Court granted allowance of appeal to consider the statutory construction of Section 17.1, the single subject requirement, and aggrieved party standing. *Spahn v. Zoning Bd. of Adjustment,* 598 Pa. 108, 954 A.2d 567 (2008).

### *Society Created to Reduce Urban Blight (SCRUB) et al. v. Zoning Hearing Board of Adjustment of Philadelphia County et al. (27 EAP 2008)*

Shannon Outdoor, LLC ("Shannon Outdoor") sought a variance to erect a billboard on Lot C of the Washington House Apartment Building, which is directly adjacent to the Schuylkill Expressway. The property is owned by a third party and had previously included an accessory sign that was twelve feet by twenty-four feet, double-sided and illuminated. By 2001, that sign had fallen into disrepair and Shannon Outdoor entered into a forty-year lease with the property owner. Shannon Outdoor then applied for a zoning and/or use permit from L & I seeking to erect a fourteen foot by forty-eight foot, double-sided and illuminated sign on the lot. L & I issued a notice of refusal because (1) the bottom edge of the sign was thirty-six feet above the road surface; (2) no sign of equal or greater value had been or was to be removed as credit for the sign; (3) the sign was within 300 feet of residentially zoned property; (4) the sign was within 600 feet of an ingress or egress ramp of the Schuylkill Expressway; and (5) the sign was within 660 feet of the outward edge of any park under the jurisdiction of the Fairmount Park Commission, the Commonwealth or the National Park Service.

Shannon Outdoor appealed the refusal to the Board and the Board conducted a public hearing on September 28, 2005. At the outset of the hearing, Shannon Outdoor requested that the Board limit testimony to only those "aggrieved persons" who had a direct interest and could be detrimentally harmed by the Board's determination. The Board did not limit such testimony, but instead permitted any Philadelphia taxpayer to speak on the matter. Those opposing the billboard included

appellants SCRUB, its representatives, members of the Wynnefield Heights Civic Association, the Belmont Village Community Association, as well as the City Planning Commission. George David, Jr. also testified, stating that he owned the adjacent property and objected to construction of the sign.

Following the hearing, the Board granted Shannon Outdoor's request for a use variance, finding that it had met its burden of proving, *inter alia,* that an unnecessary hardship would result if the variance was not granted and finding that the proposed use was not contrary to the public interest.

Appellants appealed to the trial court, which did not take additional evidence. Before the trial court, Shannon Outdoor argued that none of the objecting parties had standing to appeal the Board's decision following the General Assembly's enactment of Section 17.1.

Following oral argument, the trial court reversed the decision of the Board. The court agreed that SCRUB and related parties lacked standing, with the exception of Mr. David, who did have standing as a potentially aggrieved person and neighboring landowner. Considering the merits, the court concluded that the Board had abused its discretion in finding that Shannon Outdoor had met its burden warranting a variance. The trial court further noted that the record was devoid of any evidence to justify the Board's conclusion regarding unnecessary hardship and the public interest. Shannon Outdoor filed a motion for reconsideration, asserting that Mr. David had executed an agreement of sale with respect to his adjacent property. The trial court denied the motion. Both SCRUB and Shannon Outdoor appealed the trial court's order.

On appeal, a panel of the Commonwealth Court affirmed the trial court's decision. *SCRUB et al. v. Zoning Bd. of Adjustment,* 921 A.2d 536 (Pa.Commw.2007). As in the *Spahn* case, the first question addressed by the court related to taxpayer standing following the enactment of Section 17.1. Again, the court acknowledged that the Code previously provided for general taxpayer standing. Nevertheless, the court explained

that there was "no purpose" for the language Section 17.1 "other than to limit the broad grant of general taxpayer standing provided" in the Code. *Id.* at 543. The court also noted that SCRUB did not preserve any constitutional issues related to 53 P.S. § 13131.1.

The court then considered the issue of whether the trial court correctly determined that Mr. David had standing as an "aggrieved person" and concluded that the trial court did not err, as a matter of law, in finding he had standing. Lastly, the court found that the trial court did not err in concluding that the Board abused its discretion in granting the variance.

Judge Leadbetter concurred in the result without separate opinion.

This Court granted allowance of appeal to consider a single issue related to the statutory construction of Section 17.1. *SCRUB et al. v. Zoning Bd. of Adjustment,* 598 Pa. 107, 954 A.2d 567 (2008). We denied the petition of allowance of appeal of Shannon Outdoor on that same date. *SCRUB et al. v. Zoning Bd. of Adjustment,* 598 Pa. 791, 959 A.2d 930 (2008).

### Society Created to Reduce Urban Blight (SCRUB) et al. v. Zoning Hearing Board of Adjustment of Philadelphia County et al. (28 EAP 2008)

Keystone Outdoor Advertising leased a vacant lot located in Philadelphia's Food Distribution Center District ("FDC") from BDB Company. The parties applied to L & I for a zoning permit and/or use registration permit, seeking permission to erect a 2,400 square-foot, free-standing, double-faced, illuminated sign on the leased property. L & I refused the zoning permit because the proposed height of the sign exceeded the maximum allowable height. L & I also denied the use permit because the proposed location of the Keystone Sign was within 500 feet of another sign; the maximum allowable square footage of a sign is 1,500 feet; no existing sign or signs encompassing equal or greater sign area were being removed to comply with the provisions; and outdoor advertising signs

are prohibited in the FDC. The parties appealed to the Board.

The Board held six public hearings on the matter. Appellants SCRUB, its executive director, Wecaccoe CDC, Whitman Council, and two individuals entered their appearance at the hearings over the objections of Keystone and BDB. Following the hearings, the Board granted the use and/or zoning variance.

On appeal, Keystone and BDB filed a motion to quash the appeals alleging that appellants lacked standing under Section 17.1. The trial court agreed, citing the two prior cases addressed herein. Appellants appealed to the Commonwealth Court raising the same issues that collectively were raised in the prior cases. Appellants acknowledged that the prior cases did not support their position, and stated that in raising the issues before the Commonwealth Court, they sought only to preserve the issues for appeal.

A Commonwealth Court panel affirmed the trial court's order, explaining that the arguments of appellants failed under the prior case law. According to the court, appellants had to show that they were aggrieved in order to establish standing. The court concluded they did not do so, since appellants "fail[ed] to show or allege any interest beyond the common interest of all citizens in procuring obedience to the law." *Id.* at 403. The court also rejected appellants' argument that they had standing because they were present and participated in the hearings before the Board. Finally, the court was not persuaded that appellants had standing simply because they had homes in the general area of the subject property. This Court granted allowance of appeal to consider the statutory construction of Section 17.1, the single subject requirement, and aggrieved party standing. *SCRUB et al. v. Zoning Hearing Bd. of Adjustment,* 598 Pa. 109, 954 A.2d 568 (2008).

█ Having set forth the background of the matters that are the subject of this appeal, it is clear that they share a common issue related to the statutory construction of Section 17.1 of the Home Rule Act and its effect on the broad grant of

taxpayer standing under Section 14–1807(1) of the Code. This issue provides the appropriate starting point for our analysis, since not only is it pursued by all appellants, but also this Court as a general rule does not address the constitutionality of an act of the General Assembly if the question can be decided on other grounds. *See Commonwealth, Dep't of Transp. v. McCafferty*, 563 Pa. 146, 758 A.2d 1155, 1159 (2000).

Appellants Spahn, SCRUB and related parties make substantially similar arguments in their appeals. Appellants contend that Section 14–1807(1) of the Code creates two types of standing—that of an "aggrieved person" and that of a "taxpayer." Additionally, appellants assert that the Commonwealth Court has upheld the concept of taxpayer standing under Section 14–1807(1) as distinct from aggrieved person standing. *See SCRUB v. Zoning Bd. of Adjustment*, 908 A.2d 967 (Pa.Commw.2006); *SCRUB v. Zoning Bd. of Adjustment (Procacci)*, 729 A.2d 117 (Pa.Commw.1999). According to appellants, Section 17.1 only deals with one type of standing— aggrieved person—and does not speak to taxpayer standing. Therefore, appellants conclude that the language of Section 17.1 is clear and does nothing to alter the separate category of taxpayer standing.[3]

Alternatively, appellants ask this Court to address whether Section 17.1 superseded Section 14–1807(1) of the Code. According to appellants, zoning has always been treated as a uniquely local issue and the General Assembly has no power to overrule standing in zoning cases in Philadelphia, since it is a matter of purely local concern. Appellants also assert that the relevant provision of the Home Rule Act must expressly authorize preemption of local ordinances, especially those ordinances involving issues unique to Philadelphia. *See* Brief of Appellants SCRUB *et. al.* at 27 EAP 2008 at 43–45 and 28 EAP 2008 at 48–50, *citing Bartle v. Zoning Bd. of Adjust-*

---

3. Appellants note that the Former Philadelphia City Solicitor Pedro A. Ramos took this same position in a memorandum dated January 5, 2005 to a City Councilperson when he stated that Section 17.1 "does not on its face purport to cut back on the Code's broad grant of taxpayer standing." *See* Brief of Appellants SCRUB et al. at 27 EAP 2008, Exhibit K.

*ment,* 391 Pa. 207, 137 A.2d 239 (1958); *Ebald v. City of Philadelphia,* 387 Pa. 407, 128 A.2d 352 (1957); *In re Addison,* 385 Pa. 48, 122 A.2d 272 (1956). Similarly, appellants point to *Nutter v. Dougherty,* 595 Pa. 340, 938 A.2d 401 (2007), wherein this Court discussed the issue of whether or not a Philadelphia ordinance on election financing was preempted by the Election Code, 25 P.S. § 2600, *et seq.,* ultimately concluding that the General Assembly did not manifest an intent to occupy the field of elections so comprehensively as to preempt the local ordinance. Appellants focus on language in *Nutter* suggesting that grants of municipal power through the Act should be liberally construed in favor of the municipality and an ordinance should not be disturbed when the legislation does not address the subject matter of the ordinance.

Nominal appellee City of Philadelphia has filed a Brief presenting argument consistent with appellants' position. Similar to appellants, the City contends that Section 17.1 does not speak to the Philadelphia's taxpayer standing ordinance at all. The City points out that the term "aggrieved person" is modified by the language "as used in this section." Therefore, the General Assembly was making clear that a taxpayer could not have standing as an "aggrieved person," but did not address whether Philadelphia, under its home rule powers, could grant standing to taxpayers. Furthermore, the City avers that case law presumes that a statute does not supersede a municipal ordinance unless it expresses a clear intent to supersede.

The City also relies on the history of the bill, pointing out that the amendment of the bill to include standing was a "last minute" amendment. The City speculates that the legislators did not understand that the legislation superseded taxpayer standing because the "speed with which the statute was amended and enacted makes it nearly impossible that any members of the Assembly carefully reviewed and considered the content of the bill." Brief of Appellee City of Philadelphia, at 24. The City does not contest the constitutionality of the bill, but asks that we use the question of its constitutionali-

ty (as will be discussed under the next issue) as a tool for discerning legislative intent.

Appellee Woodstock replies that the amendment pointedly removes taxpayer standing while confirming that being "aggrieved" is the general standard. According to Woodstock, not only is the language and effect of the amendment "crystal clear," but also such an amendment is entirely consistent with Pennsylvania's statutory and constitutional scheme regarding access to state courts. Woodstock asserts that the amendment brings Philadelphia in line with the statutes governing standing for judicial review of local agency action, 2 Pa.C.S. § 752, which make no exceptions for home rule municipalities, but instead applies to "all local agencies." 2 Pa.C.S. § 751. Likewise, the Home Rule Act itself is clear that a home rule municipality's authority is subject to the limitations prescribed by the General Assembly. 53 P.S. §§ 13131 and 13133. Furthermore, Woodstock posits that case law has clarified any confusion that might arise by providing that if there is any conflict between a local home rule charter and the Home Rule Act, "the Enabling Act takes precedence and prevails." *See* Brief of Appellee Woodstock at 10, *citing Cali v. City of Philadelphia*, 406 Pa. 290, 177 A.2d 824, 835 (1962).

Appellees BDB Company and Keystone Outdoor assert that the plain language of the amendment limits standing to the "governing body" and "aggrieved persons," while expressly removing taxpayers as a separate class entitled to standing.[4] Like Woodstock, BDB Company and Keystone argue that the amendment to the Home Rule Act brings Philadelphia in accord with statewide law by making the Code consistent with local agency law. They assert that a uniform standard of "standing" is necessary so that every Pennsylvanian has an equal right of access to the courts.

BDB Company and Keystone then turn to the question of the ability of the General Assembly to limit the City's broad grant of taxpayer standing. They point out that the instant matter is not of strictly local concern and, under Article IX,

4. Appellees Patrick Gillespie and Shannon Outdoors join in this Brief.

Section 2 of the Pennsylvania Constitution, a home rule municipality **"may exercise any power or perform any function not denied by this Constitution, by its home rule charter or by the General Assembly at any time."** *See* Brief of Appellee BDB Company and Keystone Outdoor, *citing* PA. CONST., art. IX, § 2 (emphasis added). BDB Company and Keystone conclude, "[a]s so eloquently articulated in *Cali* . . . the Charter owes its breath of life and its very existence first to the Constitution of Pennsylvania, and secondly to the Enabling Act which gave it its birth, its powers and its limitations, namely the First Class City Home Rule Act. . . . Section 17.1 amends the [Home Rule] Act which gives the City its birth, its powers and sets its limits. After the passage of Section 17.1, one of those limitations is to the City's power to confer standing to appeal zoning board decisions." Brief for Appellees BDB and Keystone Outdoor at 33.

 Having set forth the parties' arguments, we turn to the first issue involving the construction of Section 17.1. An issue of statutory construction presents a pure question of law and our standard of review is de novo and our scope of review is plenary. *Lynnebrook and Woodbrook Assoc., L.P. v. Borough of Millersville*, 963 A.2d 1261, 1263 (Pa.2008).

The Statutory Construction Act provides that a court's proper role in interpreting and construing a statute is to determine the intent of the General Assembly. 1 Pa.C.S. § 1921(a). Generally, when the language of a statute is clear and free from all ambiguity, a court should not disregard the letter of the statute in order to pursue its spirit. 1 Pa.C.S. § 1921(b).

As is often the case with statutory construction questions, the parties offer conflicting constructions of the same statute. The difficulty with accepting appellants' and the City's statutory construction argument is that they appear to believe that our analysis should take into consideration the taxpayer standing provision of the Code when construing the plain language of Section 17.1. Such an analysis would be mistaken since any issue involving the construction of a statute must begin by

focusing on its plain words. Therefore, we look only to the plain language of Section 17.1, which states in relevant part, "[a]s used in this section, the term "aggrieved person" does not include taxpayers of the city that are not detrimentally harmed by the decision of the zoning hearing board or other board or commission created to regulate development." 53 P.S. § 13131.1. Furthermore, this section is contained within the Article relating to the general grants of power and authority and limitations of the Home Rule Act and is entitled "Specific powers."

The language of this section is clear. The intent of Section 17.1 was to give the specific power of standing to appeal a decision of a zoning hearing board within a city of the first class to the governing body vested with legislative powers and to "aggrieved persons." Notably, the statute does not define the term "aggrieved person" except to state what an aggrieved person is not—a taxpayer that has not been detrimentally harmed by a zoning decision, i.e., taxpayers generally. Moreover, Section 17.1 is contained in the First Class City Home Rule Act and Philadelphia presently is the only city of the first class in Pennsylvania. Thus, the plain language of the section leads to the inescapable conclusion that the General Assembly intended to limit standing to appeal a zoning decision in the City to two classes—the governing body *and* aggrieved persons—while specifically excluding the broader category of taxpayers. As succinctly stated by the Commonwealth Court, "we see no purpose of the language of Section 17.1 of the [Home Rule] Act other than to limit the broad grant of general taxpayer standing provided in Section 14–1807(1) of the Code." *Spahn*, 922 A.2d at 28. The bill reflects a legislative awareness of, and intent to alter, the City's broader approach to standing.

■ The heart of appellants' challenge in this case arises, however, not from construing the plain language of Section 17.1, but from appellants' argument that Section 17.1 could not properly remove taxpayer standing as provided for by Section 14–1807(1) of the Code because standing in zoning matters is an issue of purely local concern.

Section 14–1807(1) of the Code specifically grants taxpayer standing respecting appeals of zoning board decisions as follows:

> Any person or persons jointly or severally aggrieved by any decision of the Board, **or any taxpayer,** or any officer, department, board or bureau of the City, may appeal by presenting to the Court of Common Pleas....

Philadelphia Code Section 14–1807(1) (emphasis added).

■ The origin of this provision is the Philadelphia Home Rule Charter (hereafter "Charter"), which gave the City "all powers and authority of local self-government" and "complete powers of legislation and administration in relation to its municipal functions," as well as "the power to enact ordinances and to make rules and regulations necessary and proper for carrying into execution its powers." *See* 351 Pa.Code § 1.1–100. The Charter was adopted in 1951 pursuant to Article IX, Section 2 of the Pennsylvania Constitution[5] and the enabling First Class City Home Rule Act of 1949 (hereafter "Home Rule Act"), 53 P.S. § 13101 et seq. The Pennsylvania Constitution provides municipalities with the power of self government. The Constitution also states that "[a] municipality which has a home rule charter may exercise any power or perform any function not denied by this Constitution, by its home rule charter **or by the General Assembly at any time.**" PA. CONST., art. IX, § 2 (emphasis added). Thus, "by constitutional mandate, the General Assembly may limit the functions to be performed by home rule municipalities." *See Ortiz v. Commonwealth,* 545 Pa. 279, 681 A.2d 152, 156 (1996).

In addition to the constitutional provision, the Home Rule Act enables a city of the first class to "frame and adopt a charter for its own government." 53 P.S. § 13101. Consistent with the Constitution, Section 13131 of the Home Rule Act limits the powers and authorities of first class cities,

---

**5.** For ease of discussion we refer to the current constitutional provision. Article 9, Section 2 became the constitutional authority for home rule when a new Pennsylvania Constitution was adopted in 1968. Prior to that time, the relevant provision was Article 15, Section 1, which was adopted in 1922 and was substantively identical to the current provision.

"subject to the limitations hereinafter prescribed." 53 P.S. § 13131. Furthermore, as is made clear by the introductory language in Section 13131, the authority of first class cities is not absolute. Section 13133 describes the limitations of such power and authority, indicating that "no city shall exercise powers contrary to, or in limitation or enlargement of, powers granted by acts of the General Assembly which are ... applicable in every part of this Commonwealth ... [and] applicable to all the cities of the Commonwealth...." 53 P.S. § 13133(b) and (c).

▮▮▮ This Court has had the opportunity to interpret these provisions on other prior occasions and has explained that the Act is "subordinate to and is restricted" by acts of the General Assembly. *Cali*, 177 A.2d at 827. "Although this is clear and indisputable, it is so often overlooked or emotionally glossed over that we shall repeat: The Constitution granted and reserved to the General Assembly, and the General Assembly in turn, in granting home rule to Philadelphia, i.e., the right to frame and adopt a Charter, clearly and specifically reserved to itself *the power to impose restrictions, limitations* and regulations on any First Class City [Philadelphia] Home Rule Charter." *Cali*, 177 A.2d at 828. Thus, while the General Assembly cannot abrogate ordinances of purely local concern, the General Assembly may effectively abrogate local ordinances by enacting a conflicting statute concerning substantive matters of statewide concern. *Ortiz*, 681 A.2d at 156. Additionally, this Court has explained that ordinances of purely local concern are those that affect the personnel and administration of the local government. *Id.* at 156 n. 3. Stated differently, local ordinances enacted pursuant to the local Charter are subordinate to the Home Rule Act when the matter at issue is one of statewide concern, and where the two conflict, then the subordination mandate of the Home Rule Act takes precedence and controls.

Considering appellants' challenge under this framework, it is clear that Section 14–1807(1) must cede. We disagree with appellants' attempt to cast the standing provision of Section 14–1807(1) as a provision dealing with a purely local zoning

issue. While zoning questions generally may be matters of purely local concern, the instant question is not a question of local zoning, but of **standing** to pursue a zoning appeal in the Unified Judicial System. There can be no question that who has standing to appeal to a court of record is a substantive matter of statewide concern implicating a question of access to the courts of this Commonwealth. *See, e.g.*, PA CONST. art. V, § 1 (providing that the judicial power of Pennsylvania shall be in a unified judicial system). Considered in this light, we cannot liken this issue as to one merely affecting the personnel and administration of Philadelphia.[6] Moreover, Section 17.1 defines the parties who have standing to appeal Philadelphia zoning decisions and it specifically excludes taxpayers who are not aggrieved by the decision. The provision is directly contrary to the Philadelphia Code's broader grant of taxpayer standing in zoning appeals. Thus, the Home Rule Act takes precedence and controls. In light of the plain language of Section 17.1, the grant of taxpayer standing under Section 14–1807(1) must cede.

The multitude of cases cited by appellants do not persuade us to their position. Contrary to appellants' arguments, the decisions of *Addison, Ebald,* and *Bartle* do not compel a different result. Those decisions dealt with statutes that spoke to matters affecting the personnel and administration of offices local to Philadelphia and which were of no concern to citizens elsewhere. In *Addison,* the issue involved the administration of Philadelphia's civil service regarding the discharge of City employees. *See Addison,* 122 A.2d at 275. In *Ebald,* the issue dealt with disability compensation for Philadelphia policemen and firemen. *Ebald,* 128 A.2d at 354. In *Bartle,* the issue involved the changing of the official zoning maps of

6. We express no opinion as to whether Philadelphia had the authority to authorize a general grant of taxpayer standing under Section 14–1807(1) in the first instance. We note the issue only because it is not self-evident that a municipality may, without authorization from the General Assembly, purport to authorize standing in parties who would not satisfy the parameters of the standing doctrine, including taxpayer standing, as developed in the jurisprudence of this Court. *See, e.g., Application of Biester,* 487 Pa. 438, 409 A.2d 848 (1979); *but see Procacci,* discussed below.

Philadelphia. *Bartle*, 137 A.2d at 242. All of these cases dealt with issues of purely local concern and, as discussed previously, standing to appeal to a court of record is not an issue limited to local concern.

Appellants' reliance on *Nutter* is erroneous because preemption principles are inapplicable to the instant matter. Appellants cite *Nutter* for the proposition that, because there is no comprehensive Pennsylvania Zoning Code and zoning matters are issues of purely local concern, Section 14–1807(1), involving a matter of local concern, was not preempted by Section 17.1.

The issue in *Nutter* was whether the Election Code preempted a local ordinance limiting campaign contributions because the Code occupied the field of elections. We held that the Election Code failed "materially to address itself to campaign contribution limits," and thus there was no manifestation of a legislative intent to preempt the field of campaign contributions and the local ordinance regulating contributions could stand. *Nutter*, 938 A.2d at 416. Principles of preemption, however, are inapplicable in a case in which there is no comprehensive legislative enactment. Rather, in such instances the fundamental precepts that were previously discussed and govern the relationship between acts of the General Assembly and municipal ordinances apply. That is, "[u]nder the concept of home rule, ... the locality in question may legislate concerning municipal governance without express statutory warrant for each new ordinance; rather, its ability to exercise municipal functions is limited only by its home rule charter, the Pennsylvania Constitution, and the General Assembly." *Nutter*, 938 A.2d at 411 (*quoting City of Philadelphia v. Schweiker*, 579 Pa. 591, 858 A.2d 75, 84 (2004)). In this case, as stated previously, this is not merely a matter of "municipal governance," but a matter of statewide concern. Additionally, such functions may be limited by acts of the General Assembly, which is what occurred in this case by the enactment of Section 17.1.

Additionally, appellants' citation to *Procacci* is equally unpersuasive. While the court in *Procacci* confirmed taxpayer

standing under Section 14–1807(1) of the Code, it is of no moment to our holding today as *Procacci* pre-dated Section 17.1 and never confronted the issue of whether the General Assembly could alter the taxpayer standing provision in the Code.

 Finally, the City's invitation to take into account the process by which the statute was passed in discerning legislative intent is misplaced because we have found that the plain language of the statute conveys the General Assembly's intent. *See* 1 Pa.C.S. § 1921(b) and (c). Accordingly, we hold that the plain language of Section 17.1 removed general taxpayer standing in the City of Philadelphia.[7]

 Appellants' next challenge relates to the constitutionality of the manner in which Section 17.1 was enacted. Appellants argue that House Bill No. 1954, which became Section 17.1, contained two separate subjects in violation of the single subject rule of Article III, Section 3 of the Pennsylvania Constitution. The first subject of the bill increased fines for Philadelphia Code violations. The second subject of the bill altered the provisions governing standing in zoning appeals in Philadelphia. According to appellants, these subjects were unrelated and the standing amendment altered the original purpose of the house bill, which increased existing fines and forfeitures. Furthermore, appellants point out that the title of the statute did not discuss the elimination of taxpayer standing, but instead appeared to "provide for powers, not take them away." Brief for Appellant Spahn, at 44.

Appellants invoke this Court's opinion in *PAGE* and contend that *PAGE* is directly on point since it prohibits bills containing a number of distinct and independent subjects to be included in the same legislation. Furthermore, in *PAGE*, this Court indicated that there may be more than one amendment to a bill only if the amendments are germane to the object of the bill. Appellants assert that the amendment removing

7. As the statutory construction issue is the only issue on appeal at 27 EAP 2008, the remainder of this Opinion is relevant only to the appeals at 25, 26, and 28 EAP 2008.

taxpayer standing in a bill increasing fines and forfeitures presented two unrelated subjects that were not germane in violation of Article III, Section 3 of the Pennsylvania Constitution.

Appellants also point to the procedure that was used in passing the bill and assert that the standing amendment was added to the bill at the last minute at midnight or in the early morning before passage of the bill. According to appellants, the last minute amendment to the bill did not give the General Assembly an adequate opportunity to review the bill. Additionally, if several subjects are included in the same bill it causes confusion and that this procedure diminishes the General Assembly's responsibilities by precluding serious consideration.

Appellees BDB Company and Keystone Outdoor respond that appellants waived their right to challenge the constitutionality of Article III, Section 3 because the Attorney General's Office was not provided with notice or an opportunity to defend the legislative enactment. *See* Brief of Appellees BDB Company and Keystone Outdoor at 54–55, *citing* Pa.R.C.P. No. 235; *Maryland Cas. Co. v. Odyssey Contracting Corp.*, 894 A.2d 750 (Pa.Super.2006). Furthermore, appellees assert that even assuming the issue is not waived, it is clear that the enactment did not violate the single subject requirement. The original bill's stated purpose was to amend the Home Rule Act and never specified the sections of the Home Rule Act that were being amended. Appellees point out that the bill was simple and straightforward; both versions were two pages long. Appellees assert that the content of the bill was specific and the bill related only to Philadelphia.

Turning to the merits, BDB Company and Keystone Outdoor assert that courts presume the validity of a statute and a statute will not be declared unconstitutional unless the statute clearly, palpably and plainly violates the Constitution. *See PAGE*, 877 A.2d at 393. Furthermore, appellees point out that the purpose of House Bill No. 1954 was a bill "amending the Act of April 21, 1949," which is the Home Rule Act, and this stated purpose was enough to alert interested parties to

take notice of the contents of the bill. *See* Brief of Appellees BDB Company and Keystone Outdoor at 58–59, *citing Commonwealth ex rel. Raker v. Macelwee*, 294 Pa. 569, 144 A. 751 (1929); *Kotch v. Middle Coal Field Poor Dist., et al.*, 329 Pa. 390, 197 A. 334 (1938). According to appellees, so long as the title adequately indicates the subject matter of the bill and is not misleading, it is sufficient. Additionally, appellees aver that this Court has defined "subject" using a "common sense" definition and a bill does not violate Article III, Section 3 so long as the provisions sufficiently "constitute parts of a scheme to accomplish a single general purpose." *See* Brief of Appellees BDB Company and Keystone Outdoor at 58–59, *citing Payne v. School Dist. of Borough of Coudersport*, 168 Pa. 386, 31 A. 1072, 1074 (1895) (per curiam order affirming trial court's opinion for the reasons given by the court below). Applying these precepts to the case at hand, appellees assert that the bill addressed a single subject, namely, amendments to the Home Rule Act, setting forth the parameters of Philadelphia home rule. Appellees analogize this case to *PAGE* explaining that the original bill in that case was a one-page bill related to the duties of the state police to perform criminal history reports for persons involved in harness racing. The original bill blossomed into a final bill, which was 145 pages long. Yet, this Court still held the majority of the bill constitutional as it related to the single subject of "gaming."

In this case, we need not address appellees' challenge under Pa.R.C.P. 235 directly, since appellant Spahn gave proper notice of the issue to the Attorney General at each step of the proceedings.[8] Therefore, the only question before us, on this

8. Rule 235 requires that the Attorney General shall be "promptly" notified when a party alleges that a statute is unconstitutional. It appears that there is an open question, however, whether the rule applies to this case, since generally, the Rules of Civil Procedure do not apply to statutory appeals and zoning matters are considered statutory appeals. *See Human Dev. of Erie, Inc. v. Zoning Hearing Bd. of Millcreek Twp.*, 143 Pa.Cmwlth. 675, 600 A.2d 658, 662 (1991) (concluding that a zoning notice of appeal is a statutory appeal and citing *Appeal of Borough of Churchill*, 525 Pa. 80, 575 A.2d 550, 553 (1990) for the proposition that the rules do not apply to statutory appeals). In any event, as noted above, the record shows that appellant Spahn served the Answer to the Motion to Quash on the Attorney General,

point, is whether House Bill No. 1954 of 2003 violated the single subject requirement.[9]

There is a strong presumption that legislative enactments do not violate the Constitution, including the manner by which legislation is enacted. *See PAGE,* 877 A.2d at 393. Therefore, a statute will not be declared unconstitutional unless it clearly, palpably, and plainly violates the Constitution. *Id.* Furthermore, any doubts are to be resolved in favor of finding that the challenged enactment passes constitutional muster and there is a heavy burden of persuasion upon the party challenging the constitutionality of a statute. *Id.*

Article III, Section 3 of the Pennsylvania Constitution, relating to the form of bills, provides that "[n]o bill shall be passed containing more than one subject, which shall be clearly expressed in its title...." PA. CONST., art. III, § 3. Broadly, the purpose of this provision was to "encourage an open, deliberative, and accountable government" by limiting the practice of inserting a number of distinct and independent subjects into a single bill. *See PAGE,* 877 A.2d at 395.

Most recently, in *PAGE,* this Court had the opportunity to revisit Article III, Section 3, reiterating much of what we previously stated in *City of Philadelphia v. Commonwealth of Pennsylvania,* 575 Pa. 542, 838 A.2d 566 (2003). We confirmed that "reasonable notice is the keystone of Article III, Section 3." *PAGE,* 877 A.2d at 395. We noted that "bills are frequently subject to amendments as they proceed through the legislative process and not every supplementation of new

which was the first time the issue was raised. Similarly, appellant Spahn served the Commonwealth Court Briefs on the Attorney General, as well as the Petition for Allowance of Appeal and the Briefs before this Court. Thus, even if Rule 235 applies to the current issue, the Attorney General had notice that the constitutionality of Section 17.1 was being questioned, but apparently chose not to intervene in the proceedings.

9. Although appellants attempt to raise a challenge to the clearly expressed title requirement of Article III, Section 3, a review of the records at 25 & 26 EAP 2008 and 28 EAP 2008 reflects that the issue was not preserved before the trial court. Thus, the issue is waived. *See* Pa.R.A.P. 302(a).

material is violative of the Constitution. Thus, 'where the provisions added during the legislative process assist in carrying out a bill's main objective or are otherwise germane to the bill's subject as reflected in its title,' the requirements of Article III, Section 3 are met." *Id.* On the other hand, this recognition must be balanced against the fact that "no two subjects are so wide apart that they may not be brought into a common focus, if the point of view be carried back far enough." *Id.* at 396. Recognizing the tension that was created by these competing observations, we focused on whether there was a "single unifying subject to which all provisions of the act are germane." *Id.* at 397. Applying this test to the gaming bill that was the subject of the challenge in *PAGE*, we concluded that there was "a single unifying subject—the regulation of gaming." *PAGE*, 877 A.2d at 396. We then pointed out that "[t]he single topic of gaming does not encompass the limitless number of subjects which could be encompassed under the heading of 'municipalities'" (the subject of the challenge in *City of Philadelphia*). *Id.*

Considering the instant challenge under this framework, we conclude that the bill at issue did not violate the single subject rule. The bill applied to the single topic of Philadelphia home rule government, seeking to amend one thing—the Home Rule Act. As stated previously, the Home Rule Act only applies to cities of the first class. Philadelphia is the only city of the first class. Furthermore, the amendments at issue in this case were narrower than Philadelphia home rule, as they related to a single Article of the Home Rule Act, *i.e.*, that which defines "General Grants of Powers; Limitations" of the Home Rule Act. *See* Article II of the Home Rule Act.

Looking at the content of the bill, the bill originated as a bill increasing penalties and forfeitures for violations of the Philadelphia Code, which proposed to amend 53 P.S. § 13131 defining the "General grant of power and authority". The bill was later amended to include the standing provision at issue in this case, which proposed to amend the very next section, 53 P.S. § 13131.1, defining "Specific powers." Therefore, the Act only applied to the governance of Philadelphia and, more

specifically, both proposed amendments involved changes directly related to the grants of powers and limitations on Philadelphia Home Rule under Article II of the Home Rule Act. Therefore, the legislators had reasonable notice that the amendments were germane to the grants of powers and limitations on Philadelphia government. Following the reasoning in *PAGE*, the single topic of grants of powers and limitations on Philadelphia government certainly does not encompass the limitless subjects which could be encompassed by a broader heading, such as municipalities, since the amendments were related to a narrower single subject. Accordingly, we conclude that appellants have failed to discharge their heavy burden of showing that the single subject requirement was violated in this matter.[10]

Finally, appellants alternatively contend that they have standing to pursue the appeals under traditional notions of standing, i.e., as "aggrieved" parties as set forth in *William Penn Parking Garage v. City of Pittsburgh*, 464 Pa. 168, 346 A.2d 269 (1975) (plurality). Before we turn to the substance of appellants' arguments, however, we note that the parties overlook that Section 17.1 now controls the issue of standing in appeals from zoning determinations.[11]

By enacting Section 17.1 the General Assembly has designated the door through which *any party* seeking to appeal a decision of a zoning hearing board or "other board or commission created to regulate development within the city" must enter in order to have standing to appeal. Additionally,

10. The concurring and dissenting opinion by Justice Baer posits that the single subject "Philadelphia home rule government" is more akin to the subject of "municipalities" that we found to be constitutionally infirm in *City of Philadelphia, supra*. While we agree with the dissent that *City of Philadelphia* and *PAGE* can be read in harmony, and, indeed, should be, we conclude that the subjects to be amended were germane to the single subject of general grants of powers and limitations on Philadelphia government and the result in this case is consonant with both *PAGE* and *City of Philadelphia*.

11. Although not raised by either party, the effect of Section 17.1 on traditional notions of standing must be addressed because the question is so intertwined with appellants' assumption that they may attempt to invoke an alternative avenue of standing under *William Penn*.

as discussed previously, the General Assembly gave standing to appeal a zoning decision in Philadelphia to two classes of persons and entities—the governing body and "any aggrieved person." In this case, appellants are not a "governing body" and the relevant question for our purposes is whether they are an "aggrieved person" as set forth in Section 17.1. Once again, as stated previously, Section 17.1 merely states who an "aggrieved person" does not include, *see infra* at p. 1143, but does not define who an "aggrieved person" is and we must turn to the tools of statutory construction to discern the answer to this question.

 The relevant provision of the Statutory Construction Act states that "words and phrases shall be construed according to the rules of grammar and according to their common and approved usage; but technical words and phrases and such others as have acquired a peculiar and appropriate meaning . . . shall be construed according to such peculiar and appropriate meaning or definition." 1 Pa.C.S. § 1903(a). The latter concept "includes words or terms that have acquired a particular meaning in the law." *See Toy v. Metropolitan Life Ins. Co.*, 593 Pa. 20, 928 A.2d 186, 195 (2007) (*citing Semasek v. Semasek*, 509 Pa. 282, 502 A.2d 109, 111 (1985)). "Aggrieved person" has acquired a particular meaning in the law. In *William Penn*, we explained that the core concept of standing was that a party had to be "aggrieved." 346 A.2d at 280–81. And, "aggrieved" when used in terms of standing is generally understood to mean that the person "has a substantial, direct and immediate interest in the claim sought to be litigated" as set forth in *William Penn*. *See, e.g., Hospital & Health System Ass'n of Penn. v. Dep't of Public Welfare*, 585 Pa. 106, 888 A.2d 601, 607 (Pa.2005) (explaining that under *William Penn* "where a person is not adversely affected in any way by the matter challenged, he is not aggrieved and thus has no standing to obtain a judicial resolution of that challenge."); *Bergdoll v. Kane*, 557 Pa. 72, 731 A.2d 1261, 1269 (1999); *see also Sparacino v. Philadelphia Zoning Bd. of Adjustment*, 728 A.2d 445, 448 (Pa.Commw.1999) (explaining that 2 Pa.C.S. § 752, which provides that "any person ag-

grieved" by an adjudication of a local agency, means that the person must establish standing under *William Penn*). By employing the term "aggrieved person" without further explication of that phrase, we conclude that the General Assembly intended to use that phrase as it is generally understood in the law as set forth in *William Penn*. Our conclusion today may be different if the General Assembly had seen fit to include a further explanation of "aggrieved person" within Section 17.1. *See, e.g., Citizens Against Gambling Subsidies, Inc. v. Pennsylvania Gaming Control Board*, 591 Pa. 312, 916 A.2d 624, 628 (2007) (explaining that for purposes of 2 Pa.C.S. § 702, notions of traditional aggrievement do not apply because the General Assembly expressly qualified the term "aggrieved" to mean a party having a "direct interest" in the proceedings).. But, in the absence of further guidance from the General Assembly on the meaning of "aggrieved person" as contained within Section 17.1, we conclude that the General Assembly intended to use that phrase as it has acquired a particular meaning in the law as defined by *William Penn*.

Having concluded that by employing the term "aggrieved person" in Section 17.1, the General Assembly intended to use the term as generally understood and defined in *William Penn*, we now turn to the parties' arguments regarding whether appellants are "aggrieved persons" under the *William Penn* standard.

Appellant Spahn points out that an "aggrieved" party is one who is directly, adversely, immediately, and substantially affected by a judgment, decree or order. *See William Penn*, 346 A.2d at 282–83. Spahn asserts that he is aggrieved since he lives a block and a half away from the subject property and walks by the property every day. According to Spahn, the granting of the variance will have a negative effect on property value, aesthetics, and neighborhood revitalization.

Appellants SCRUB and the civic organizations assert that they have a historical track record in the community of opposing zoning variances that detrimentally impact the community. Appellants point out that there are no neighbors in some areas of Philadelphia to object to zoning issues and

public policy interests will not be served unless groups like SCRUB are given standing. Appellants assert that case law supports standing of civic groups as "aggrieved parties" as long as those groups have an interest in improving and preserving a certain area. *See Society Hill Civic Ass'n v. Philadelphia Bd. L & I*, 905 A.2d 579 (Pa.Commw.2006); *Pittsburgh Trust for Cultural Resources v. Zoning Board of Adjustment of Pittsburgh*, 145 Pa.Cmwlth. 503, 604 A.2d 298 (1992).[12]

Finally, appellants SCRUB and the civic organizations also contend that they are "aggrieved" parties, since members of their groups live in the vicinity of the proposed billboard sign and could see the sign from their homes. Furthermore, the organizations claim to have an interest in assuring that their communities are unaffected by blight, in fostering community development, and in opposing illegal billboard signs.

Appellee Woodstock replies that appellant Spahn has not established that he was aggrieved in any way. Appellee asserts that Spahn presented no evidence of any adverse effect resulting from the Board's action. His position before the Board was that Woodstock did not comply with the zoning requirements and did not meet its burden of proof entitling it to a variance and, therefore, he has no interest other than that common to all citizens in the area and does not meet the "aggrieved" party definition of standing.

Appellees BDB Company and Keystone Outdoor also filed a reply asserting that under the aggrieved party definition set forth in *William Penn*, a party seeking standing must establish a harm that is "real and concrete, rather than abstract." Brief of Appellees at 34 (*quoting William Penn*). Appellees

12. Appellants SCRUB and the civic organizations also assert that they have standing because they participated in the hearings before the Board. According to appellants, the Commonwealth Court has allowed standing to a party based upon mere participation as objectors before a zoning board. *See Johnson v. Zoning Hearing Bd. of Richland Twp.*, 95 Pa.Cmwlth. 82, 503 A.2d 1117 (1986); *Baker v. Zoning Hearing Bd. of West Goshen*, 367 A.2d 819 (Pa.Commw.1976). This argument, however, fails to acknowledge the effect of Section 17.1, which, as discussed previously, limited standing to "aggrieved persons" as defined by *William Penn* and its progeny.

claim that appellants cannot meet this definition since the record demonstrates that none of the individual appellants live closer than 1.2 miles from the area in which the billboard will be placed.

BDB Company and Keystone Outdoor argue that *Society Hill* and *Pittsburgh Trust* do not grant general standing to any civic group whose mission is to preserve a certain area. Rather, in those cases, the civic groups had intimate involvement with the projects and the members resided in the immediate neighborhoods affected by the projects. Thus, appellees conclude unless a civic association can show that one of its members is suffering immediate or threatened injury as a result of the challenged action, the association does not have standing. Brief of Appellees BDB Company and Keystone Outdoor at 41 *citing North–Central Pennsylvania Trial Lawyers Ass'n. v. Weaver*, 827 A.2d 550 (Pa.Commw.2003).

 Our resolution of this final issue is straightforward. As we have concluded that Section 17.1 incorporated the concept of standing as set forth in *William Penn*, we turn to *William Penn* for guidance on this question. Under *William Penn*, a party is aggrieved if the party can show an interest that is substantial, direct, and immediate. *Id.* at 280. In order to be substantial, there must be some discernible effect on some interest other than the abstract interest all citizens have in the outcome of the proceedings. *Id.* at 282. In order to be direct, the party must show some causation of harm to his interest. *Id.* In order to be immediate, there must be a causal connection between the action complained of and the injury to the person challenging it. *Id.* at 282–83. Thus, for example, we concluded that an alumni association of a charitable school did not have standing to challenge the Board of Directors' management of a charitable trust, since the litigation would not affect the Association itself; "it los[t] nothing and gain[ed] nothing" by the outcome of the litigation. *In re Milton Hershey School*, 590 Pa. 35, 911 A.2d 1258, 1263 (2006). Similarly, we held that potential applicants for slot machine gaming licenses did not have standing to bring a facial constitutional challenge to the Gaming Act, 4 Pa.C.S.

§ 1101 *et seq.*,[13] because they did not establish that their interest in the outcome was greater than that of any other citizen and they did not assert that the challenged section harmed them personally in any way. *See Pittsburgh Palisades Park, LLC v. Commonwealth of Pennsylvania,* 585 Pa. 196, 888 A.2d 655, 660 (2005).

Applying these concepts to the instant matters, appellants have not demonstrated an interest greater than any other citizen of Philadelphia. Regarding the civic associations' appeal at 28 EAP 2008, the associations essentially admit that their purpose in bringing the action is to enforce zoning provisions of the Philadelphia Zoning Code, oppose the erection of illegal billboards, and foster community development. These purposes while laudable, are no different from the abstract interest that all citizens have in the outcome of the proceedings. Additionally, although appellants claim that they have members who live in the "vicinity" of the proposed sign, these members reside over a mile from the proposed sign. Under such facts, appellants cannot establish that they have standing as an "aggrieved" party.

Turning to appellant Spahn, appellee Woodstock correctly points out that his argument before the Board was a legal one—directed at whether appellee Woodstock established that there was an unnecessary hardship requiring the grant of the variance. Therefore, he failed to establish that he was "aggrieved" by the granting of the variance. Accordingly, the lower courts appropriately concluded that appellants did not satisfy the traditional notions of common law "aggrieved" party standing.

Having concluded that appellants have not established that they are "aggrieved persons" under Section 17.1, we will briefly address the civic association appellants' remaining arguments.[14] Appellants point to *Society Hill* and *Pittsburgh*

13. The full title of the act is "The Pennsylvania Race Horse Development and Gaming Act."

14. This matter is concluded with regard to appellant Spahn as he is not aggrieved and does not raise the additional standing issues.

*Trust* in support of their argument that the concept of "aggrievement" has been expanded when civic associations are involved and civic associations should be granted standing in cases in which their mission or purpose is implicated. However, these cases are factually distinguishable from the matters before this Court. The lower courts determined that the groups involved would be aggrieved by the challenged decision under *William Penn* and did not indicate a grant of standing to civic associations generally. Thus, in *Society Hill* the court pointed out that the association was intimately involved in the negotiations for the preservation of facades of the townhouses in the Society Hill area and that the associations had participated in the public hearings. Furthermore, the association's purpose was to promote preservation of historic buildings in the Society Hill area of Philadelphia. *Society Hill,* 905 A.2d at 587. In *Pittsburgh Trust,* the court relied on the fact that the location of the Trust offices were within 200 feet of the proposed relocation of an arcade and that the Trust had made a substantial financial investment in the surrounding area before the court found that the Trust had standing. Contrary to the suggestion of appellants, *Society Hill* or *Pittsburgh Trust* do not support the assertion that a civic association does not have to meet the *William Penn* "aggrieved" party requirements in order to have standing.

Based upon our analysis herein, we conclude that Section 17.1 limited the broad grant of general taxpayer standing provided for in the Code. Moreover, appellants have not established that the enactment of Section 17.1 violated the single subject rule or that they are entitled to standing as an "aggrieved persons" under Section 17.1. Accordingly, the orders of the Commonwealth Court are affirmed.

Justice GREENSPAN did not participate in the consideration or decision of this case.

Justices EAKIN, TODD, and Justice McCAFFERY join the opinion.

Justice BAER files a concurring and dissenting opinion.

Justice SAYLOR files a dissenting opinion.

Justice BAER, concurring and dissenting.

I agree with the Majority's conclusion that the plain language of Section 17.1 of the First Class City Home Rule Act ("Home Rule Act"), 53 P.S. § 13131.1, eliminated the right of Philadelphia taxpayers, absent aggrievement, to appeal zoning decisions impacting facilities or locale in Philadelphia, which had previously been granted by Section 14–807(1) of the Philadelphia Code. Nevertheless, I would not find this ruling dispositive of this case because I believe that House Bill No. 1954, which amended Section 17.1 of the Home Rule Act, violated the single subject rule of Article III, Section 3, of the Pennsylvania Constitution.

As the Majority recognizes, Article III, Section 3, sets forth a dual mandate for the General Assembly, precluding the passage of a bill that contains more than one subject, and requiring that such subject be clearly expressed in the bill's title. *Pennsylvanians Against Gambling Expansion Fund v. Commonwealth ("PAGE")*, 583 Pa. 275, 877 A.2d 383, 394 (2005).[1, 2] The general aim of this constitutional provision is to "place restraints on the legislative process and encourage an open, deliberative, and accountable government." *Id.* at 395 (citations omitted). More specifically, Article III, Section 3, was adopted "to curb the practice of inserting into a single bill a number of distinct and independent subjects of legislation and purposefully hiding the real purpose of the bill." *Id.* at 395. Related thereto, the single subject requirement prohibits

---

**1.** Article III, Section 3 of the Pennsylvania Constitution provides:

No bill shall be passed containing more than one subject, which shall be clearly expressed in its title, except a general appropriation bill or a bill codifying or compiling the law or a part thereof.

PA. CONST. Art. 3, § 3.

**2.** The Majority correctly notes that any challenge to the clearly expressed title requirement of Article III, Section 3, was waived, as it was not preserved before the trial court. Majority Op. at 109 n. 9, 977 A.2d at 1147 n. 9. Thus, this opinion addresses only the single subject provision of Article III, Section 3.

the attachment of riders that could not become law on their own to popular legislation, and ensures more considered review of proposed legislation by lawmakers. *Id.* Thus, in accord with the constitutional language and the goals it furthers, we have held that the various provisions of legislation must assist in carrying out the bill's main objective or be otherwise "germane" to the bill's principal subject to pass constitutional muster. *Id.* (citing *City of Philadelphia v. Commonwealth*, 575 Pa. 542, 838 A.2d 566, 587 (2003)).

Application of the germaneness test to real-life scenarios, however, has proven to be difficult, as the restrictions set forth in Article III, Section 3, do not lend themselves to a bright-line rule. This Court has recently acknowledged that interpretations of this constitutional provision have historically fluctuated from fairly strict constructions, which constrain the Legislature by striking as unconstitutional presumably multisubject legislation, to more liberal interpretations, which afford deference to the Legislature's bill-drafting procedures. *See City of Philadelphia*, 838 A.2d at 587.

For example, in *Commonwealth ex rel. Woodruff v. Humphrey*, 288 Pa. 280, 136 A. 213, 217 (1927), this Court applied somewhat of a strict constructionist approach and viewed a bill that regulated land surveyors and professional engineers as containing two separate subjects. We rejected the contention that the legislation addressed the single subject of the regulation of the engineering profession, which would encompass land surveyors as a minor branch thereof. Instead, the Court relied on the legislation's repeated reference to the profession of engineering "or" land surveying, thus conveying the idea of two separate professions, which indicates two separate subjects of the bill.

Similarly, in *Yardley Mills Co. v. Bogardus*, 321 Pa. 581, 185 A. 218 (1936), this Court examined legislation which contained three provisions, which: (1) relieved water canal companies of the obligation to maintain waterways obtained from the Commonwealth; (2) granted such companies the right to sell the water from these waterways for commercial purposes; and (3) authorized the Commonwealth to acquire water canal lands by

gift, and to sell portions of them. Notwithstanding that all of the provisions pertained to the subject of water canals, we held that the various provisions were not sufficiently germane to one another to survive scrutiny under the single subject test. *Id.* at 221.

Conversely, in *Fumo v. Public Util. Comm'n,* 719 A.2d 10 (Pa.Cmwlth.1998), the Commonwealth Court applied the germaneness test and upheld a bill which addressed the number of years that a taxicab could be operated and the deregulation of electricity generation. Allegedly affording deference, the court found that the statute did not violate Article III, Section 3's single subject requirement, reasoning that both topics involved aspects of public utility regulation and amendments to the Public Utility Code. *Id.* at 14.

Similarly, in *City of Philadelphia v. Schweiker,* 817 A.2d 1217 (Pa.Cmwlth.2003), the Commonwealth Court upheld legislation which: (1) authorized the Governor, rather than the Mayor, to appoint members of the Philadelphia Parking Authority; and (2) required the Municipal Authority to transfer enumerated funds to the Philadelphia School District. Notwithstanding the disparate nature of the provisions, the Commonwealth Court held that the bill at issue did not violate Article III, Section 3, because municipalities and parking authorities are "inextricably intertwined," and that the overall subject of the legislation was "authorities that benefit municipalities." *Id.* at 1225.[3]

While I am confident that the General Assembly can perform its legislative function under either a strict or liberal construction paradigm, it clearly has the right to know the standard under which it is required to operate. As this case presents an opportunity for this Court to juxtapose two recent pronouncements, *City of Philadelphia* and *PAGE,* on this important constitutional issue and to reconcile them, I offer

---

3. In recognition of this trend, this Court expressed concern that this application of Article III, Section 3, "has resulted in a situation where germaneness has, in effect, been diluted to the point where it has been assessed according to whether the court can fashion a single, overarching topic to loosely relate the various subjects included in the statute under review." *City of Philadelphia,* 838 A.2d at 587.

my views as to why this case falls under the holding of the former, and is thus unconstitutional, as opposed to the Majority's conclusion that it is controlled by the latter, and is therefore constitutional.

In *City of Philadelphia*, the bill at issue amended Title 53 (Municipal Corporations) of the Pennsylvania Consolidated Statutes by, *inter alia*, modifying local governance and related administrative matters; altering the size and composition of the Pennsylvania Convention Center's governing board; repealing a portion of the Pennsylvania Intergovernmental Cooperation Authority for Cities of the First Class; and adding to Title 53 a new "Chapter 58," entitled "Contractor Bonds and Financial Security for Redevelopment Contracts." *Id.* at 571. In response to a challenge that the legislation violated the single subject requirement of Article III, Section 3, the Commonwealth parties maintained that all of the provisions of the bill related to the single subject of "municipalities."

Our Court rejected this contention, holding that the vast subject of "municipalities" encompassed virtually all matters of local government, and was too broad to qualify for single-subject status under Article III, Section 3. *Id.* at 589. Finding the object of the bill to be an omnibus amendment of Title 53 of the Pennsylvania Consolidated Statutes, we concluded that there was no single unifying subject to which all of the provisions of the act were germane. *Id.* While recognizing that it was appropriate, to some degree, under a "deference standard" to hypothesize reasonably broad topics of legislation in evaluating Article III, Section 3 challenges, we stated, "[t]here must be limits, however, as otherwise virtually all legislation, no matter how diverse in substance, would meet the single-subject requirement." *Id.* at 588.

We cautioned that, absent such limitation, "Section 3 would be rendered impotent to guard against the evils that it was designed to curtail." *Id.* Significant to the instant case, this Court expressly discounted the constitutional significance of the fact that all of the provisions of the challenged statute were ultimately codified within Title 53. *Id.* at 590. Specifically, we stated:

Finally, that all of the statute's provisions are ultimately codified within Title 53 is of little constitutional importance. *Cf. DeWeese [v. Weaver,* 824 A.2d 364,] 370 [(Pa.Cmwlth. 2003)] ("The fact that the changes in substantive law ... were set forth as amendments to the Judicial Code does not, in and of itself, satisfy the requirements of Article III, Section 3.").

*City of Philadelphia,* 838 A.2d at 590.

While I was not a member of the Court when *City of Philadelphia* was decided, I am bound by the decision and, in any event, agree with its sound reasoning.

Two years later, after I joined the Court, we again examined Article III, Section 3, in a unanimous opinion in *PAGE*. *PAGE* involved legislation that authorized the Pennsylvania State Police to aid the State Harness and Horse Racing Commissions by performing criminal history checks and verifying fingerprints of applicants for licensure under the Race Horse Industry Reform Act of 1981. The bill was extensively amended, and, in its final form, created the Pennsylvania Gaming Control Board; addressed the issuance of gambling licenses authorizing the creation of slot machine casinos; dealt with the generation and distribution of revenues from the licenses and the creation of numerous funds; and provided for administration and enforcement of the legislation, placing in our Court exclusive jurisdiction over enumerated gaming appeals.

We upheld the statute against a challenge based on Article III, Section 3, finding that the single unifying subject of most provisions of the bill at issue was the regulation of gaming.[4] Thus, we concluded that this complex piece of legislation passed constitutional muster because the provisions therein logically related to the single subject of gaming. We distinguished *City of Philadelphia,* noting "[t]he single topic of gaming does not encompass the limitless number of subjects

4. In *PAGE,* a few provisions of the bill addressing funding issues were found to violate the single subject rule, while the clear majority of the provisions were upheld.

which could be encompassed under the heading of 'municipalities.' " *Id.*, at 396.

I find *City of Philadelphia* and *PAGE* to be in harmony with one another because the purported subjects of the bills at issue are distinguishable in their scope. As noted above, the different subjects covered in *City of Philadelphia* were simply too disparate. Conversely, the legislation at issue in *PAGE*, regardless of the bill's length or complexity, involved the single issue of gaming (except for those few provisions that this Court properly struck for lack of germaneness).

In the matter before us, the Legislature passed a simple and understandable bill. In its first section, the bill increased fines and forfeitures for violations of the Philadelphia Code. In the second provision of the bill, it eliminated taxpayer standing in Philadelphia zoning cases. In applicable part, the question before us is whether these two provisions are germane to each other; in other words, whether these two provisions are legitimately tied to a single subject. I am compelled, in good faith, to answer "no" because I find that the subject of "amendment to the Home Rule Act" or "Philadelphia government" is more akin to the constitutionally infirm subject of "municipalities" in *City of Philadelphia*, than the cohesive subject of "gaming" present in *PAGE*.

I fully recognize that this Court should not strike a legislative enactment unless it clearly, plainly and palpably violates the Constitution. *DePaul v. Pennsylvania Gaming Control Board*, 969 A.2d 536, 545 (Pa.2009). However, I hearken back to the sage wisdom of *City of Philadelphia*, which warned that acceptance of "municipalities," and here, "Philadelphia home rule government" as constitutionally authorized single subjects would stretch the constitutional safeguards beyond recognition, and relegate the constitutional protection to little more than rhetoric. *See City of Philadelphia*, 838 A.2d at 588, citing, *Payne v. School Distr. of Borough of Coudersport*, 168 Pa. 386, 31 A. 1072, 1074 (1895) (*per curiam*) (indicating that "no two subjects are so wide apart that they may not be brought into a common focus, if the point of view be carried back far enough").

For these reasons, I would clarify for the Pennsylvania Legislature that both *City of Philadelphia* and *PAGE* were correctly decided, and that the statute under scrutiny herein falls under the precedent established in *City of Philadelphia*, and consistent therewith should be stricken as unconstitutional.

Justice SAYLOR, dissenting.

On the question of whether Act 193 of 2004 violates the Pennsylvania Constitution's single-subject rule, I find this to be a close case and believe that the majority and Mr. Justice Baer both supply reasoned arguments in support of their respective positions. For the following reasons, however, I ultimately favor the view articulated by Justice Baer, that the act contains multiple subjects in violation of Article III, Section 3, and join his opinion except as noted below.

It is true, as the majority emphasizes, that both substantive sections of the bill amend the First Class City Home Rule Act to enhance or delimit the specific powers of first-class cities: Section 1 increases the monetary ceiling for fines and forfeitures resulting from violations of city ordinances, rules, and regulations, and Section 2 gives the city's legislative body standing to challenge decisions of the zoning hearing board. Certainly, the first of these items constitutes a relatively minor modification to the Home Rule Act. The second one also appears, at first glance, to represent a slight adjustment to a first-class city's powers. If that were the extent of the issue, I would conclude that, while the specific type of municipal authority addressed in each section is arguably unrelated to the other, they are permissible in one bill insofar as both pertain specifically to the local powers of the governing bodies in cities of the first class. *See generally City of Phila. v. Commonwealth*, 575 Pa. 542, 578, 838 A.2d 566, 588 (2003) ("We believe that exercising deference by hypothesizing reasonably broad topics in this manner is appropriate to some degree, because it helps ensure that Article III does not become a license for the judiciary to 'exercise a pedantic tyranny' over the efforts of the Legislature." (quoting *In re*

*Commonwealth, Dep't of Transp.*, 511 Pa. 620, 626, 515 A.2d 899, 902 (1986))).

The difficulty, for me, arises from the broader implications of the change in standing. Section 2 of the bill (adding Section 17.1 to the Home Rule Act) alters the class of parties with standing to pursue zoning appeals, as previously controlled by Section 14–1807(1) of Philadelphia's Home Rule Charter. It does this by, at a minimum, granting standing to the city's legislative body. *See* 53 P.S. § 13131.1. Additionally, according to the construction of that provision adopted by both the majority and Justice Baer, it removes the power of first class cities broadly to provide for taxpayer standing relative to zoning disputes. *See* Majority Opinion, at 101–02, 977 A.2d at 1143; Concurring and Dissenting Opinion, at 118–19, 977 A.2d at 1153 (Baer, J.). One argument interposed against the enforceability of the act as interpreted thusly is that taxpayer standing within a first class city is a matter of purely local concern and, therefore, the Philadelphia Home Rule Charter's provision in this regard may not be superseded by state law. *See* Brief for Appellant at 39. The majority answers this contention by observing that standing to pursue a zoning appeal in the state's Unified Judicial System has a statewide dynamic, as it defines the class of parties authorized to invoke the resources of the Commonwealth's judiciary as a whole, including its appellate courts. *See* Majority Opinion, at 103–04, 977 A.2d at 1144.[1] Thus, it is apparent that, although in

---

1. Although, for the reasons below, I ultimately find it unnecessary to determine whether the Legislature intended, through Section 2 of the bill, to eliminate taxpayer standing in first-class cities, and although I agree with the majority's observations concerning the statute's statewide effect, I do not believe it is necessary to predicate the statute's enforceability in this respect on its non-local ramifications. As a general rule, the Legislature may restrict a city's home rule powers by simply amending the appropriate enabling act, *see Ortiz v. Commonwealth*, 545 Pa. 279, 285, 681 A.2d 152, 156 (1996); *Cali v. City of Phila.*, 406 Pa. 290, 297–98, 177 A.2d 824, 828 (1962); *see also City of Phila. v. Schweiker*, 579 Pa. 591, 611, 858 A.2d 75, 87 (2004) (noting that the General Assembly "retains express constitutional authority to limit the scope of any municipality's home rule governance"), or, indeed, by amending any enactment affecting only that class of city, *see id.* at 611, 858 at 87–88 (distinguishing generally-applicable state laws from those pertaining only to first-class cities for purposes of the supersession analysis).

one sense Section 2 of Act 193 is limited to amending the specific powers of first class cities—or their governing bodies—on matters of purely local interest, in a broader sense that provision (and only that provision) touches on matters of statewide concern.

This is not to say that the General Assembly could never include two provisions in a single bill where only one has a statewide dynamic. Here, however, the two substantive sections of Act 193 address essentially unrelated topics, and the second section only controls access to a branch of the Commonwealth's government. Under these circumstances, I would conclude that the latter provision is simply too far removed from the former to satisfy the germaneness test that this Court has developed in relation to Article III, Section 3's single-subject rule.

Finally, under the above analysis I would find that the bill violates the single-subject rule regardless of whether Section 2's narrow definition of "aggrieved person" was intended to eliminate taxpayer standing as granted by Section 14–2807 of the Philadelphia Home Rule Charter. This is because, either way, Section 2 grants standing to a city entity (the City Council) that did not previously have standing. Accordingly, I would decline to reach the statutory construction issue. In all other respects I join Justice Baer's concurring and dissenting opinion.