# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

The Faithful Laurentians, by Their    :
Trustees Ad Litem, Carolyn Devine    :
and Venise Whitaker,    :
              Appellant    :
   :
       v.    :   No. 1440 C.D. 2017
   :   ARGUED: November 15, 2018
City of Philadelphia, Zoning Board    :
of Adjustment    :
   :
       v.    :
   :
1600 Berks, LLC    :

BEFORE:   HONORABLE MICHAEL H. WOJCIK, Judge
              HONORABLE ELLEN CEISLER, Judge
              HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge[1]

<u>OPINION NOT REPORTED</u>

MEMORANDUM OPINION
BY JUDGE CEISLER                  FILED:     February 12, 2019

Appellant "The Faithful Laurentians, by Their Trustees Ad Litem, Carolyn Devine and Venise Whitaker" (Appellant or Faithful Laurentians)[2] appeals from the Court of Common Pleas of Philadelphia County's (Trial Court) August 29, 2017, Order quashing Appellant's appeal of the City of Philadelphia (City), Zoning Board

---

[1] This case was argued before a panel of the Court that included Senior Judge James Gardner Colins, as well as Judge Michael H. Wojcik and Judge Ellen Ceisler. Because Senior Judge Colins' service on this Court ended on December 31, 2018, this matter has been submitted on briefs to Senior Judge Leadbetter as a member of this panel.

[2] A trustee *ad litem* is one who is appointed by the court and "stands in a fiduciary or confidential relation to another; [especially], one who, having legal title to property, holds it in trust for the benefit of another and owes a fiduciary duty to that beneficiary." TRUSTEE, Black's Law Dictionary (10th ed. 2014).

of Adjustment's (Board) decision granting dimensional and use variances to Linden Lane Capital Partners, LLC (Linden) pertaining to Saint Laurentius Polish Catholic Church (Church), an historically designated, deconsecrated church located at 1600-1618 Berks Street in Philadelphia (Property). The Trial Court quashed the appeal due to Appellant's lack of standing to appeal. After thorough review, we affirm the Trial Court.

## I. Background

The legal structure of the Faithful Laurentians is not clearly articulated in the record, but it appears to be an informal group of citizens who advocate for the preservation and reuse of Church, which is located on the Property. *See* Trial Ct. Op. 11/29/17 at 6-7; Appellant's Br. at 10; Notes of Testimony (N.T.), 11/1/16, at 20.[3] Ms. Whitaker and Ms. Devine indicate that they are the Faithful Laurentians' trustees *ad litem*; however, it is important to note, at the outset, that neither woman offered any proof whatsoever that they were appointed as such by any court. Ms. Whitaker has apparently taken the lead on garnering support of citizens interested in preserving the Church. *See, e.g.,* N.T., 11/1/16, at 31-33.

The Property consists of seven separate parcels of land and is owned by the Archdiocese of Philadelphia (Archdiocese), which deconsecrated and closed the Church in 2014. N.T., 11/1/16, at 5. The Church has been vacant since then and was deemed by the Philadelphia Department of Licenses and Inspections (L&I) to be

---

[3] Appellant asserts, without elaboration, that it is an "unincorporated association." Appellant's Br. at 10. According to Black's Law Dictionary, an unincorporated association is one which "is not a legal entity separate from the persons who compose it." ASSOCIATION, Black's Law Dictionary (10th ed. 2014). *See also Krumbine v. Lebanon Cty. Tax Claim Bureau*, 663 A.2d 158, 160 (Pa. 1995) ("Absent express statutory authority, however, an unincorporated association is not a legal entity; it has no legal existence separate and apart from that of its individual members.").

unsafe due to serious structural problems. Board's Op., Findings of Fact (F.F.) ¶¶10, 12. "Documentation from the Department updated on October 14, 2016, rated the priority of the violations as 'unsafe.'" *Id.*, F.F. ¶12.

The Archdiocese eventually sold part of the Property to Linden,[4] which became the equitable owner of the portion of the Property containing the Church under a January 26, 2016, Agreement of Sale. *See* Agreement of Sale at 1-2. This Agreement is contingent upon Linden successfully obtaining a use variance enabling transformation of the Church into multi-unit residential housing, as well as several dimensional variances. *Id.* at 1-2, Ex. C; Board's Op., F.F. at ¶1; N.T., 11/1/16, at 2.

On July 27, 2016, Linden submitted a zoning permit application to L&I, seeking authorization to convert the Property into twenty-three units of residential housing while preserving the Church's historic exterior. Board's Op., F.F. ¶1. On August 12, 2016, L&I denied the application because the Property is zoned RSA-5, which only permits that the Property be used for single-family residential homes. *Id.*, F.F. ¶2; *Id.*, Conclusions of Law (C.L.) ¶2; N.T, 11/1/16, at 5, 7. On August 15, 2016, Linden appealed to the Board. Board's Op., F.F. ¶3.

On November 1, 2016, the Board conducted a hearing on Linden's use and dimensional variances application. N.T., 11/1/16, at 7; Board's Op., F.F. ¶13. At this hearing, Linden's attorney noted that the Property is currently zoned RSA-5, which permits construction of single-family homes. N.T., 11/1/16, at 5, 8; Board's Op., F.F. ¶13. However, Linden's attorney stated that even this kind of permissible development would require demolition of the Church, and that "few other

---

[4] On February 1, 2018, Linden assigned all its rights, duties and obligations under its Agreement of Sale with the Archdiocese to 1600 Berks, LLC (Berks). *See* Application for Relief, 3/5/18, at 2. On May 2, 2018, this Court amended the caption to reflect the substitution of Berks for Linden.

opportunities [exist] for this site that would not require some measure of Board relief[,]" due to the restrictive nature of the RSA-5 zoning regulations. N.T., 11/1/16, at 5, 8; Board's Op., F.F. ¶¶13, 16.

Linden's attorney asserted that, if his client's application was granted, its proposal to convert the Church into a 23 unit, multi-family dwelling would not only save it from demolition, but would have the added benefit of restoring the Church's crumbling exterior. N.T., 11/1/16, at 6; Board's Op., F.F. ¶¶11, 15, 16. In addition, Linden's attorney maintained that his client was requesting only the minimum variance relief necessitated under the circumstances, relief which would nominally impact the surrounding community. N.T., 11/1/16, at 14-15, 31; Board's Op., F.F. ¶19.

Testifying in favor of the requested variances were representatives from the Philadelphia Planning Commission[5] and the Preservation Alliance.[6] N.T., 11/1/16,

---

[5] Planning Commission representative Ronald Bednar appeared at the zoning hearing and testified [that the Commission supported Linden's] proposal, saying:

> We believe the project is significant within the community by protecting a historic property from demolition by having an adaptive reuse of a church into 23 dwelling units. In consultation with staff of the Historic Commission, this may be the most feasible project that will protect the exterior of the [C]hurch. If this building was demolished, the development could place 14 to 25 single family homes depending on the surrounding lot size with no unit required parking.

[N.T., 11/1/16,] at 4.

Board's Op., F.F. ¶23.

[6] Patrick Grossi, representing the Preservation Alliance, "a preservation advocacy, nonprofit devoted to promoting historic spaces," testified that his organization supports the proposal

4

at 4, 17. Testifying in opposition to the application were representatives from the area councilman's office and the Fishtown Neighbors' Association, a registered community organization for the geographic area around the Property. *See* Board's Op., F.F. ¶¶22-35, 37-40, 42.[7] The Board also received and considered letters and petitions from individuals and organizations who both opposed and supported Linden's development proposal. *Id.*, F.F. ¶43.

Ms. Whitaker also testified in opposition to Linden's application, submitting "a mission plan and a business plan," in which she proposed alternative uses of the building. Board's Op., F.F. ¶36. The main thrust of Ms. Whitaker's opposition however, was that it was her belief that the Archdiocese was not authorized to sell the Property because the "Church is a charitable deed and trust . . . [and therefore] belongs to [its] parishioners." N.T., 11/1/16, at 31-32; Board's Op., F.F. ¶36.

On November 15, 2016, the Board approved Linden's application and granted the requested variances. Board's Op., C.L. ¶¶9, 17-18. The Board concluded that the Property's current zoning restrictions only allowed for the construction of single-family homes and a limited number of non-residential zoning uses. *Id.*, C.L. ¶¶11-12. The Board also determined that, in order for single-family homes to be constructed on the Property, the existing church structure would have to be demolished, which would require approval from the City's Historical Commission.

---

"because we agree . . . this conversion is likely the most viable path forward for ensuring that the building remains standing." [N.T., 11/1/16,] at 17. . . . Mr. Grossi said "creative adaptive reuse projects such as this one is really the kind of outcome that we would like to see more of in countless vulnerable churches across the city." [N.T., 11/1/16,] at 17-18.

*Id.*, F.F. ¶¶24-25.

[7] Individuals testifying in opposition to the variance were community members A.J. Thompson, Philip Harter, Jesse Gardner and Ryan Sweeney. *Id.*, F.F. ¶¶21, 28, 34, 38-39, 43-44.

5

*Id.*, C.L. ¶12. The Board concluded that the restrictive zoning in that specific area constituted sufficient evidence to support a finding of unnecessary hardship that was not self-imposed, and that Linden satisfied all of the requisite variance relief criteria in the Philadelphia Code (Code). *Id.*, C.L. ¶¶4, 13-16. For example, the Board noted that Linden's proposal would not include alterations to the exterior of the Church, other than those necessary to repair the sections which are deteriorating. *Id.*, C.L. ¶15. Additionally, the Board concluded that the proposed use of the Property was compatible with public health, safety and welfare, as it would "preserve an historically significant structure, return a vacant building to a use compatible with surrounding uses, and eliminate unsafe and unsightly conditions that now exist at the Property." *Id.*, C.L. ¶16.

On December 4, 2016, Appellant appealed the Board's decision to the Trial Court. Original Record (O.R.) at 3. On July 14, 2017, the City and Linden (collectively, Appellees) filed a motion to quash Appellant's appeal in the Trial Court, arguing that Appellant lacked standing because no one had appeared or objected on behalf of the Faithful Laurentians association at the November 1, 2016, Board hearing. *Id.* at 12. The Trial Court heard oral argument on the appeal and, by Order dated August 29, 2017, granted Appellees' motion, thereby quashing Appellant's appeal due to lack of standing. *Id.* at 14. This appeal followed.

## II. Issues

On appeal,[8] Appellant argues that the Trial Court erred by quashing its appeal on the issue of standing because Appellant established representational standing

---

[8] Since Appellees properly raised the question of Appellant's standing at the Trial Court level, *Scott v. City of Philadelphia, Zoning Board of Adjustment*, 126 A.3d 938, 948-50 (Pa. 2015), we review the challenged ruling to determine whether the Trial Court committed an abuse of

6

through its members who testified at the Board's hearing. Appellant's Br. at 8, 14-20. Appellant next maintains that the Trial Court improperly concluded that Appellant *also* had to establish that it had organizational standing in order to appeal the Board's decision. *Id.* at 8, 20-24. Third, Appellant states that the Trial Court mistakenly relied upon Appellant's April 20, 2017, Fictitious Name Registration to determine that Appellant did not exist before that date, ignoring the distinction between such registrations and the nature of unincorporated associations. *Id.* at 8, 24-26. Finally, Appellant posits that the City does not have standing to contest this appeal, as the City did not enter an appearance at the Board's November 1, 2016, hearing. *Id.* at 27.[9]

### III. Discussion

Zoning in Philadelphia is governed by both Chapter 14 of the Code and the First Class City Home Rule Act (Home Rule Act).[10] *Scott v. City of Philadelphia, Zoning Bd. of Adjustment*, 126 A.3d 938, 948 (Pa. 2015). The Code does not define who constitutes a "party" before the Board, nor does it limit who may appear and participate at zoning hearings. *Id*. However, while there not strict guidelines on who

---

discretion or error of law. *Gateside-Queensgate Co. v. Del. Petroleum Co.*, 580 A.2d 443, 445 (Pa. Cmwlth. 1990).

[9] Unfortunately, Appellant's brief is riddled with confusing misapplications of law. Rather than address each error, we will apply the correct law as it relates to the issues presented by Appellant. Additionally, some of Appellant's arguments were confusingly worded, so we have done our best to correctly interpret Appellant's arguments.

[10] Act of April 21, 1949, P.L. 665, *as amended*, 53 P.S. §§ 13101-13157. This Act allows "[a]ny city of the first class" to pass a home rule charter. 53 P.S. § 13101. A city of the first class has at least 1,000,000 residents. *Id.* at § 101. Philadelphia enacted its Charter nearly 70 years ago and has been operating under home rule ever since. *See City of Philadelphia v. Schweiker*, 858 A.2d 75, 81 n.9 (Pa. 2004) ("Philadelphia adopted its home rule charter under the terms of the [. . .] Home Rule Act on April 17, 1951; it went into effect on January 7, 1952.").

may **appear** before the Board, only certain individuals are permitted to **appeal** Board decisions to the trial courts. *See id.* Section 17.1 of the Home Rule Act identifies those persons as follows:

> In addition to any aggrieved person, the governing body vested with legislative powers under any charter adopted pursuant to this act shall have standing to appeal any decision of a zoning hearing board or other board or commission created to regulate development within the city. As used in this section, the term "aggrieved person" does not include taxpayers of the city that are not detrimentally harmed by the decision of the zoning hearing board or other board or commission created to regulate development.

53 P.S. § 13131.1.[11]

Thus, in order to have standing to appeal a decision of the Board to the trial court, Section 17.1 of the Home Rule Act requires that an appellant must be an "an aggrieved person." However, "[a] party is not necessarily aggrieved simply because he or she appeared or participated before the Board." *Scott*, 126 A.3d at 949. Rather, for a party to be 'aggrieved,' that party must establish on appeal to the Trial Court that it has an interest that is "substantial, direct, and immediate." *Spahn v. Zoning Board of Adjustment*, 977 A.2d 1132, 1151 (Pa. 2009) (citing *William Penn Parking Garage, Inc. v. City of Pittsburgh*, 346 A.2d 269, 280 (Pa. 1975)); *see Scott*, 126 A.3d at 949 ("[T]o appeal from the Board to the trial court, an appellant must demonstrate in the trial court, if challenged, that he is aggrieved pursuant to *William Penn* and as applied in *Spahn*, and may not avoid this obligation by arguing that the landowner failed to challenge standing before the Board.").

To qualify as a "substantial" interest, "there must be some discernible effect on some interest other than the abstract interest all citizens have in the outcome of

---

[11] Added by Act of November 30, 2004, P.L. 1523.

8

the proceedings." *Spahn*, 977 A.2d at 1151 (internal citation omitted). For an interest to be "direct," the party must demonstrate that his or her interest was harmed. *Id*. Finally, to be "immediate," "there must be a causal connection between the action complained of and the injury to the party challenging the action." *Id*.

Here, Appellant claims it has representational standing to appeal the Board's decision because some of its members testified during the Board's November 1, 2016, hearing. Appellant's Br. at 8, 14-20. However this assertion is belied by the Board record. At the Board's hearing on November 1, 2016, not a single person who testified identified themselves as a member of the Faithful Laurentians or stated that they were appearing on its behalf. *See* O.R. at 238-70. Rather, the protesting attendees who filled out appearance statements, but who did not testify, show that they were present in the "capacity" of an "immediate neighbor," "neighbor," or "protestant," were appearing on behalf of the "interested party," "St. Laurentius," or "St. Laurentius Church," or merely indicated their names and addresses without stating their capacity and/or whom they represented. *Id*.

Additionally, no one, including Ms. Devine and Ms. Whitaker, the Faithful Laurentians' putative trustees *ad litem*,[12] averred at the hearing that they represented the Faithful Laurentians or were testifying on its behalf. Ms. Devine did not testify at the hearing, but merely filled out an appearance statement indicating that she was an "interested party" on behalf of "St. Laurentius." *See id.* at 253; N.T., 11/1/16, at 1-48. Though Ms. Whitaker did testify, she did not appear as Appellant's representative, but as an interested party for "St. Laurentius Church" because "[t]he community asked" her to do so:

---

[12] Again, there is *no proof whatsoever* that either Ms. Devine or Ms. Whitaker were ever appointed trustees *ad litem* by any Court.

9

MS. WHITAKER: Afternoon. I am going to make it short and sweet for you, but I have just some handouts.

MR. GALLAGHER [Board's Sitting Chair]: Give one to Adam, please. Your name and address.

MS. WHITAKER: [Venise] Whitaker, 1468 East Wilt Street, six doors from the church.

MR. GALLAGHER: Okay.

MS. WHITAKER: I am third generation from St. Laurentius. Overall, in those plans, you will see that I formed with the board that we have a mission plan and a business plan. We are in the works of talking to the Archdiocese. We have a church preservationist with us who saves [*sic*] St. Mary's in Conshohocken. He has worked with over 11 churches and saved them. He already has a history of working with the Archdiocese. That is Brody Howell from New York. He wasn't able to make it here. I have also in there it shows that St. Laurentius Church is a charitable deed and trust. It belongs to the parishioners. I have with me ledgers of parishioners that go all the way back to 1855 that are with us. In addition, I have 470 signatures from past parishioners, current — past parishioners, Fishtown people and River Works. I have 728 signatures from the Change.org. **This is that [*sic*] we're asking the . . . Attorney General, to support us to overturn the deed and return it to us.**

MR. LAVER [Linden's attorney]: I would respectfully object based on relevance.

MR. GALLAGHER: Can I just offer – I hear what you're saying. That is really not before the Board. That is a law issue that is way above the purview of this Board. We understand.

MS. WHITAKER: Okay.

MR. GALLAGHER: What is before the Board is converting this to single[-]family homes. Any new plans and all that, that is not before us unfortunately. I understand what you're trying to do. We appreciate what you're trying to do. We really do. But it's just really not relevant to the issue at hand.

MS. WHITAKER: I know. I just felt –

MR. GALLAGHER: I know you want to be on the record and you want to be heard.

MS. WHITAKER: **The community asked me. I am actually a student now at Citizen Planning Institute**.

MR. GALLAGHER: I understand.

MS. WHITAKER: So I can become more familiar with this.

MR. GALLAGHER: We are very sensitive to the issues. But again, we got to stay with zoning, please.

MS. WHITAKER: I will pass it over to other experienced. Thank you very much.

N.T., 11/1/16, at 31-33 (emphasis added); *see* O.R. at 251 (Ms. Whitaker's appearance statement).

Since no one identified themselves before the Board as appearing on behalf of the Faithful Laurentians, it remains that Appellant thus failed to establish that the Faithful Laurentians was an aggrieved party with representational standing in this matter. *See Newtown Heights Civic Ass'n v. Zoning Hearing Bd. of Newtown Twp.*, 454 A.2d 1199, 1201 (Pa. Cmwlth. 1983) (association does not have representational standing to appeal in situation where one of its members participates in a zoning hearing as a self-identified community member or community representative, rather than expressly on behalf of the association). Given these facts, we hold that the Trial Court did not err in granting Appellees' Motion to Quash.

Next, Appellant appears to claim that the Trial Court incorrectly held that an organization must establish standing in its own right, in addition to establishing representational standing.[13] However, this is a fundamental misreading of the Trial

---

[13] Specifically, Appellant confusingly asserts that:

> The Common Pleas Court essentially held that before an association may assert representational standing, the association must first appear at the zoning hearing to establish that it has personal

11

Court's reasoning. The Trial Court concluded that Appellant "lacked standing to appeal the Board's decision because no one formally appeared or otherwise objected on [its] behalf . . . at the November 1, 2016 [Board] hearing[.]" Tr. Ct. Op. at 6. Thus, contrary to Appellant's claim, the Trial Court never held that establishment of organizational standing was a prerequisite for invoking representational standing.

Appellant next argues that the Trial Court erred in concluding that the Faithful Laurentians did not have standing to appeal because the "Faithful Laurentians" fictitious name registration was not actually filed until April 2017, thereby establishing that the Faithful Laurentians did not exist at the time of the November 1, 2016, Board hearing. Appellant argues that "[a]n unincorporated association does not require any particular form or filing to be established. An unincorporated association is not even required to register its name as a fictitious name, *see* 19 Pa. Code §17.203" Appellant's Br. at 24. For this reason, Appellant claims that, since an unincorporated association can exist without filing any formal paperwork establishing its legal status or a fictitious name registration, the fact that the Faithful Laurentians did not file their fictitious name registration until after the Board hearing is not relevant as to when the Faithful Laurentians was created. *Id.* at 24-26. We agree with Appellant in this regard. However, whether the Trial Court was mistaken on this issue ultimately has no bearing on the resolution of this matter, since no one

---

standing. In other words, the Court held that the standing of the members cannot be invoked by an association unless the association can establish standing on its own. This is directly contrary to the settled caselaw that it is NOT necessary for an association to have standing, and therefore that it is NOT necessary for an association to establish standing at the [Board] to assert representational standing at a later time.

Appellant's Br. at 20. We have interpreted Appellant's argument to the best of our ability.

12

identified themselves at the hearing as appearing on behalf of the Faithful Laurentians.

Finally, Appellant waived its claim that the City could not challenge Appellant's standing, as Appellant did not raise this argument before the Trial Court. Pa. R.A.P. 302(a). Moreover, this argument fails on its merits, given that the Board is undoubtedly a component of the City's governing apparatus, one given life through Philadelphia's Home Rule Charter, as well as the Code itself. *See* Phila. Home Rule Charter §§ 3-911 and 4-607; Code §§ 14-104 and 14-301(4) (establishing the Board and its powers); *see also* Phila. Home Rule Charter § 1-100;[14] *id.* at § 1-102 (vesting the City's executive and administrative powers in its Mayor and its "officers, departments, boards and commissions.").

## Conclusion

Therefore, as Appellant did not have standing to appeal the Board's November 15, 2016, decision to grant Linden's sought-after variances, we conclude that the Trial Court properly granted Appellees' Motion to Quash and affirm the Trial Court.

ELLEN CEISLER, Judge

Judge Brobson did not participate in the decision of this case.

---

[14] Pursuant to Section 1 of Article XV of the [Pennsylvania] Constitution and the Act of the General Assembly, approved April 21, 1949, P.L. 665, of the Commonwealth of Pennsylvania, the City . . . shall have and may exercise all powers and authority of local self-government and shall have complete powers of legislation and administration in relation to its municipal functions, including any additional powers and authority which may hereafter be granted to it.

Phila. Home Rule Charter § 1-100.

13

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

The Faithful Laurentians, by Their : 
Trustees Ad Litem, Carolyn Devine :
and Venise Whitaker, :
                   Appellant :
                    :
       v. : No. 1440 C.D. 2017
                    :
City of Philadelphia, Zoning Board :
of Adjustment :
                    :
       v. :
                    :
1600 Berks, LLC :

## **O R D E R**

AND NOW, this 12th day of February, 2019, the Court of Common Pleas of Philadelphia County's Order in the above-captioned matter, dated August 29, 2017, is hereby AFFIRMED.

                                      ELLEN CEISLER, Judge